IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID NOLAN and KEITH SUSKI,      )
                                  )
            Plaintiffs,           )
                                  )
    v.                            )    No.  06 C 5615
                                  )
MIDWEST GENERATION, LLC,          )
                                  )
            Defendants.           )

MEMORANDUM OPINION AND ORDER

David Nolan ("Nolan") and Keith Suski ("Suski") were demoted by their employer, Midwest Generation, LLC ("Midwest"), after they had taken extensive leaves of absence because of physical injuries. Nolan and Suski have sued Midwest for asserted discrimination in violation of the Americans with Disabilities Act ("ADA"), as well as advancing state-law claims for breach of contract and intentional infliction of emotional distress.

Midwest now moves for summary judgment under Fed. R. Civ. P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Midwest's motion is well-taken, and this action is dismissed in its entirety.

Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor

(Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.).

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts viewed in the light most favorable to nonmovants Nolan and Suski--but within the limitations created by the extent of their compliance (or noncompliance) with the strictures of LR 56.[1]

## Background

Midwest produces electrical power for wholesale on the open market (M. St. ¶5). In December 1999 Midwest acquired several generating stations from Commonwealth Edison Co. ("ComEd")(id.). Nolan and Suski had been employed by ComEd since 1981 (N-S Add. St. ¶¶1, 23), but they became Midwest employees on December 15,

---

[1] Midwest's LR 56.1 Statement of Undisputed Facts is cited "M. St. ¶--" and Nolan's and Suski's joint responses are cited "N-S St. ¶--," while their additional factual statements are cited "N-S Add. St. ¶--." Where the factual assertion in an original statement is unrebutted, only the original will be cited. Finally, citations to Midwest's Memorandum and Nolan's and Suski's Responsive Memorandum (each cited "Mem.") will use the same "M." and "N-S" lead-ins.

1999 (M. St. ¶¶13, 40). Both Nolan and Suski are members of International Brotherhood of Electrical Workers Local 15 ("Union"), and the terms and conditions of their employment with Midwest are governed by a collective bargaining agreement ("CBA") between Midwest and Union (id. ¶62).

Because of a reduction in force in the spring of 2002, both Nolan and Suski elected to transfer to Midwest's Waukegan Generating Station ("Waukegan Station")(M. St. ¶¶13, 40). Both had worked as maintenance mechanics since the beginning of their employment at Midwest, and they continued in that capacity at the Waukegan Station (id.).

Maintenance mechanics primarily maintain all of the mechanical equipment in the plant (M. St. ¶7).[2] According to the position description generated by Midwest, maintenance mechanics are occasionally required to bend, stoop, reach, push, pull, walk, sit, stand and climb (M. St. App. Tab C, Dep. Ex. 22).

While employed by ComEd Nolan suffered a meniscus tear in a work-related injury in 1999 (N-S Add. St. ¶2). Since then he has undergone four surgeries on his knees (id. ¶3). Suski had both hips replaced in 1999-2000 and had surgery on his back in May 2002 and February 2005 (id. ¶¶24-25).

Between December 15, 1999 and December 10, 2004 Nolan missed

---

[2] That equipment includes boilers, turbines, generators, furnaces, pumps, valves, boiler casings, gaskets, pipes, tubes, fuel and ash handling systems and auxiliary equipment (id.).

3

343 days due to his knee injury and other causes--38% of all available work days for 2002-04 (M. St. ¶¶50-51). During that same period Suski missed 616 days due to his back and other causes--58% of all available work days in 2000 and 2002-04 combined (id. ¶¶52-53).[3]

For part of the time that Nolan was at work he was limited by multiple medical restrictions, including "no standing, walking, carrying, or climbing" (M. St. ¶30). Nolan worked in the tool crib signing out tools for the night shift (a sedentary job) for four months in 2003 (id. ¶31).

On December 10, 2004 Midwest demoted both Nolan and Suski from the position of maintenance mechanic to that of laborer (N-S Add. St. ¶¶4, 26). Both were on leave at that time.[4] Under the terms of Midwest's disability benefits plan, their pay was not

---

[3] Those absence totals do not include days off for holidays, vacations or a 2001 labor strike (id. ¶¶50, 52).

[4] On July 21, 2004 Nolan reported some soreness in his knee and was told by his supervisor to go home and consult a doctor (N-S Add. St. ¶5). Nolan's doctor imposed a restriction of no lifting and prescribed "sitting work only" (M. St. ¶36). Midwest did not offer Nolan such work, so Nolan remained home (N-S St. ¶36) and underwent surgery in October 2004 (N-S Add. St. ¶12). It was not until February 10, 2006--more than 1-1/2 years after he went on leave--that Nolan returned to work (M. St. ¶39). Even then he could work only with permanent medical restrictions, and Midwest did not require him to perform any tasks that conflicted with his medical restrictions (id.). As for Suski, on August 11, 2004 he went on leave to undergo back surgery and was completely unable to perform any of his job duties (id. ¶47) until he returned to work without restrictions on July 25, 2005--almost a year after he went on leave (N-S Add. St. ¶27).

4

reduced until they returned to work (M. St. ¶59).

Laborers are tasked with performing cleaning and basic building and grounds maintenance work at Waukegan Station (M. St. ¶9). They perform some heavy physical labor, including operating jack hammers, excavating, cleaning roofs and shoveling coal (id.).[5] Midwest deems laborers less critical than maintenance mechanics (id. ¶56) and accordingly pays them less per hour (N-S Add. St. ¶20).

Nolan and Suski immediately grieved their demotions through the Union (M. St. ¶66). Separate arbitrations found that Midwest was within its rights under the CBA to demote Nolan and Suski and resolved the grievances in Midwest's favor (id. ¶¶68-69). Both Nolan and Suski attempted to secure (1) promotions back to their previous maintenance mechanic positions and (2) transfers to other stations, but all those requests were denied (N-S Add. St. ¶20-21; N-S St. ¶72).

### ADA Claims

It is unlawful for an entity covered by the ADA to (42

---

[5] M. St. ¶¶11 and 12 explain why those components of the laborer job requirements do not contraindicate the reassignment of employees such as Nolan and Suski from maintenance mechanic to laborer status. Although N-S St. ¶¶11 and 12 deny those record-supported assertions, what those paragraphs say by way of response do not negate the substantially lesser flexibility in dealing with absences at the maintenance mechanic level--a legitimate management concern reserved to Midwest and involving no prohibited discrimination (disability-based or otherwise).

5

U.S.C. §12112(a)[6]):

> discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

To that end Nolan and Suski "must establish that (1) [they] suffer[ ] from a disability as defined in the ADA, (2) [are] qualified to perform the essential functions of the job in question, with or without reasonable accommodation, and (3) [have] suffered an adverse employment action as a result of [their] disabilit[ies]" (Dargis v. Sheahan, 526 F.3d 981, 986 (7th Cir. 2008), adapted to this case).

In the employment context the ADA prohibits discrimination only against a "qualified individual with a disability" (Section 12112(a)). To meet the burden of proving that he or she is a qualified individual (Winfrey v. City of Chicago, 259 F.3d 610, 614 (7th Cir. 2001)), a plaintiff "must (1) satisfy the requisite skill, experience, education and other job-related requirements of the position [he] holds or desires and (2) establish that he can perform the essential functions of such position with or without accommodation" (Dargis, 526 F.3d at 986 (internal quotation marks omitted)). Nolan's and Suski's claims fail the second of those requirements: They were unable to perform the

---

[6] Further ADA citations will take the form "Section --," omitting the prefatory 42 U.S.C.

6

essential functions of the maintenance mechanic position.[7]

Midwest's written job description for the maintenance mechanic position includes numerous physical demands and a variety of tasks as essential functions (M. St. App. Tab C, Dep. Ex. 22).[8] At the time of the demotions Nolan was restricted to seated work with occasional standing (N-S St. ¶37(a)), and Suski could not perform any work functions at all (M. St. ¶47). More importantly, neither of the two came to work: Suski was absent for six months and Nolan for five before their demotions (M. St. ¶¶36-38, 48).[9] That lack of capacity to perform the essential functions of the position is fatal to both claims, because "[i]nability to work for a multi-month period removes a person from the class protected by the ADA" (Byrne v. Avon Prods., Inc.,

---

[7] Suski does not argue that he is actually disabled. Instead he contends that Midwest perceived him as disabled at the time of the demotion (N-S Mem. 6), which would qualify him as disabled for ADA purposes (Section 12102(2)(C)).

[8] Nolan challenges that list--not on its face, but solely by asserting that there were other tasks that he could have performed with his medical restrictions (N-S Mem. 5). Not only will this Court not attempt to "second-guess the employer as to the essential functions" of a position (Peters v. City of Mauston, 311 F.3d 835, 845 (7th Cir. 2002)), but--as will be seen later--the limited duties Nolan proposes also do not amount to full performance of the maintenance mechanic position.

[9] Nolan argues that he could not come back to work because Midwest and its insurance company were dragging their feet to approve his surgery (N-S Mem. 3-5). But that issue is not material--even post-surgery he was still medically restricted, so that he could not fulfill the full duties of the maintenance mechanic position (see n.4).

7

328 F.3d 379, 381 (7th Cir. 2003)).[10]

Nolan urges that he could have performed the functions of his job if Midwest had accommodated his disability by allowing him to work full-time in the tool crib or cleaning sootblowers (N-S Mem. 5). But, as this Court has held in its earlier order dismissing Nolan's and Suski's reasonable accommodation claim, no charge of a lack of reasonable accommodation was lodged with the EEOC (Dkt. 31). And maintenance mechanics are required to do much more than sign out tools in the tool crib (an assignment that is usually given to the senior maintenance mechanic on duty). To alter the job duties materially downward would overstep the bounds of reasonable accommodation (Byrne, 328 F.3d at 381):

> The sort of accommodation contemplated by the Act is one that will allow the person to "perform the essential functions of the employment position." Not working is not a means to perform the job's essential functions. An inability to do the job's essential tasks means that one is not "qualified"; it does not mean that the employer must excuse the inability.

Nolan's inability to perform most of the duties of a

---

[10] Midwest also asserts that because Suski recovered fully from his injury, he was only temporarily disabled (M. Mem. 8), and "the temporarily disabled are not protected by the Americans with Disabilities Act" (Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1197 (7th Cir. 1997)). Suski responds by asserting that Midwest perceived him as disabled. But because he is not a qualified individual in any event, it is unnecessary to consider whether Suski is disabled within the meaning of the ADA. Whether or not he was perceived as disabled, he was also seen-- correctly--to be absent from work.

8

maintenance mechanic means that he is not a qualified individual (Dargis, 526 F.3d at 987). Midwest accommodated his injury and absences for five years--even stationing him occasionally in the tool crib--before concluding that he could not fulfill the duties of the maintenance mechanic position. Midwest was under no obligation to create a new, modified maintenance mechanic position for Nolan, and the fact that it had previously tried to work with him "will not count as evidence that the position it created is in fact the full [maintenance mechanic] position" (Winfrey, 259 F.3d at 616). Indeed, any creation of a permanent tool crib maintenance mechanic position would have forced the removal of senior maintenance mechanics from their tool crib duties, a change that would likely have engendered resentment among its employees and would be much like "reverse" discrimination--a course of action that is surely not commanded by the ADA (Matthews, 128 F.3d at 1196).

Suski urges that he was not actually demoted until he returned to work on July 25, 2005 because his pay was not decreased until that day (N-S Mem. 7). And, according to Suski, he was a qualified individual on that day because he was not limited by any restrictions and was capable of performing all the essential functions of a maintenance mechanic (N-S Mem. 6-7).

That argument misses the mark entirely. December 10, 2004 rather than July 25, 2005 is the pertinent date here, because

that is when Suski and Nolan were demoted: "whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision" (Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996)). Although the pay decrease did not go into effect until Suski returned to work in July 2005, the employment decision was implemented on December 10, 2004. And as of that date Suski was unable to perform any of the functions of a maintenance mechanic, so he was not a qualified individual.[11]

In sum, Nolan's and Suski's ADA claims must be and are dismissed. This opinion turns to their other claims.

## Section 301 Preemption

Midwest contends that Nolan's and Suski's state-law claims implicate the CBA between Midwest and the Union (M. Mem. 9-10, 12) and are therefore preempted by Labor Management Relations Act §301 ("Section 301,"[12] 29 U.S.C. §185). Section 301 preempts state-law remedies whenever resolution of a plaintiff's claim is

---

[11] Suski's attempt to avoid that result is also self-defeating. If he actually was demoted at the time of his return to work without restrictions, then he was not disabled when he suffered that adverse employment action (and because he returned to work fully capable of performing physical tasks, it makes little sense to argue that Midwest perceived him as disabled). That alone would put Suski outside the protection of the ADA (Section 12102(2)).

[12] Because the statutory numbering is so different, no confusion is created by using the generic "Section" to denote provisions of both the ADA and the statute just cited in the text.

10

substantially dependent on analysis of the terms of a CBA (Tifft v. Commonwealth Edison Co., 366 F.3d 513, 516 (7th Cir. 2004)). Such preemption is necessary, according to Livadas v. Bradshaw, 512 U.S. 107, 121-23 (1994), to retain consistency in the interpretation of terms common to CBAs and to prevent parties from relabeling, as state-law claims, actions that in actuality arise under a CBA.

Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988) teaches that Section 301 requires more than a tangential linkage between a CBA and a state-law claim to trigger preemption:

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles--necessarily uniform throughout the Nation--must be employed to resolve the dispute.

Mere consultation of a CBA is not enough to cause preemption (Tifft, 366 F.3d at 516). As long as a state-law claim can be resolved without construing the CBA itself, Section 301 does not preempt it (Lingle, 486 U.S. at 409-10).

Nolan's and Suski's breach of contract claims do not stem from the CBA at all. They rely instead on the "Q&A" section of a separate and company-wide attendance policy.[13] Hence Section 301

---

[13] About the same time that Midwest circulated its company-wide attendance policy to all employees, it also circulated a

11

works no preemption against those claims.

Nolan's and Suski's intentional-infliction-of-emotional distress allegations present another story. To prevail on such a claim under Illinois law, a plaintiff must show that defendant's conduct was "outrageous" to the point of being "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community" (Kolegas v. Heftel Broadcasting Corp., 154 Ill.2d 1, 21, 607 N.E.2d 201, 211 (1992)). As Douglas v. Am. Info. Techs. Corp., 877 F.2d 565, 571 (7th Cir. 1989) explains:

> However, analysis of an employee's intentional infliction of emotional distress claim may well require a court to refer to and interpret the contract provisions governing the terms and conditions of her employment. Specifically, a court's determination of whether the defendant's allegedly wrongful conduct was "extreme and outrageous" may turn on the meaning of various provisions of the collective bargaining agreement.

So to the extent the intentional infliction of emotional distress claims are grounded in Midwest's demotion of Nolan and Suski, they are preempted by Section 301 because resolution of those claims would require construction of the language in the CBA guaranteeing Midwest the right to demote its employees.[14]

---

separate attendance statement that applied only to Union employees (N-S Add. St. ¶29).

[14] As part of the CBA, Midwest has "the sole and exclusive right to manage the business and to take such measures as management may solely determine to be necessary for the orderly, efficient and profitable operation of the business...[and] to

12

Similarly, a factfinder could not determine whether Midwest's denial of Nolan's and Suski's promotion and transfer requests was beyond all possible bounds of decency without examining what responsibility Midwest had under the CBA to grant or entertain such requests.

Nolan and Suski have already grieved their complaints about their demotions through the process set forth in the CBA, and separate arbitrators found that Midwest did not breach the CBA in demoting them (M. St. ¶¶68-69). Those arbitration determinations are final and binding on Nolan and Suski, barring any present claim that their demotions were in violation of the CBA (M. St. ¶65). As for any other activity by Midwest that Nolan and Suski find outrageous but that requires interpretation of the CBA, again they must conform to the grievance procedure outlined in the CBA (Republic Steel Corp. v. Maddox, 379 U.S. 650, 652 (1965)). That procedure does not begin in federal court (M. St. ¶¶64-65), and those charges too must be dismissed.

### Intentional Infliction of Emotional Distress

In summary, of the numerous acts that Nolan and Suski say caused them emotional distress, only those that do not require construction of the CBA survive preemption (Lingle, 486 U.S. at 409-10). They comprise only Nolan's charges that Midwest asked

---

direct the working forces, including the right to hire, promote, transfer or demote any Employee" (M. St. ¶63).

him to clean pigeon excrement out of equipment, required him to operate a service elevator and offered to promote him back to his maintenance mechanic position if he dropped this lawsuit (N-S Mem. 10-11). Even though those charges now lack federal underpinning, this Court need not relinquish jurisdiction over them because the outcome is already apparent (Williams Elecs. Games, Inc. v. Garrity, 479 F.3d 904, 907 (7th Cir. 2007)).

Here is the standard for such claims (Schiller v. Mitchell, 357 Ill.App.3d 435, 446, 828 N.E.2d 323, 333 (2d Dist. 2005)(citation omitted)):

> To establish a claim for intentional infliction of emotional distress, a plaintiff must show (1) that the conduct was truly extreme and outrageous, (2) that the actor intended that his conduct inflict severe distress or knew that there was a high probability that his conduct would inflict such distress, and (3) that the conduct in fact caused severe emotional distress. Liability arises only where the conduct complained of was atrocious, and utterly intolerable in a civilized community.

And "[w]hether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances" (Graham v. Commonwealth Edison Co., 318 Ill.App.3d 736, 745, 742 N.E.2d 858, 866 (1st Dist. 2000)).

Based on the laborer position description, Midwest's requests that Nolan clean pigeon excrement out of equipment and operate a service elevator for other employees (work that he rejected) do not rise to the level of outrageousness necessary to sustain a claim for intentional infliction of emotional distress.

14

Laborers "perform all types of manual labor" (including cleaning), as set forth in the position description (M. St. App. Tab C, Dep. Ex. 23). Because those tasks must perforce be performed by some employee, and because they fit within the "laborer" job description, it was not outrageous for Midwest to ask or expect Nolan to perform these duties. Lastly, Midwest's offers to promote Nolan if he dropped this lawsuit (what Nolan calls "coercion" and what Midwest calls "settlement offers"[15]) are likewise not objectively outrageous (see, e.g., Schiller, 357 Ill.App.3d at 448-52, 828 N.E.2d at 335-38 and cases cited there).

Thus none of Nolan's allegations of wrongdoing rises (or perhaps falls) to the level of shocking conduct required to sustain a claim for intentional infliction of emotional distress under Illinois' law. That claim cannot survive summary judgment either.

### Breach of Contract

That leaves only the Nolan-Suski breach of contract claims under Illinois law. As with the other state-law claim just dispatched, that subject may be resolved here and now.

Nolan and Suski have hitched their breach of contract wagon to Midwest's company-wide attendance policy that details

---

[15] Midwest provides no explanation as to why those "settlement offers" were communicated directly to Nolan rather than to his attorney.

disciplinary procedures for "controllable absences"[16] that are "in excess of two days per quarter or eight days per year" (M. St. ¶60).[17] That policy contains a "Q&A" section that states in part (M. St. ¶61):

> Employees who miss work due to a serious health condition or illness involving inpatient care or continuing treatment by a health care provider will not have that time count against the two days per quarter/eight days per year for disciplinary purposes.

To be sure, all reasonable inferences must now be drawn in Nolan's and Suski's favor. But no admissible evidence reasonably supports the conclusion that their demotions were disciplinary in nature.[18] Nolan did receive a reprimand regarding his attendance

---

[16] "Controllable absences" include illnesses, illnesses in the family, medical or dental appointments, unplanned vacations and time off without pay (M. St. ¶60).

[17] It is assumed arguendo here that the attendance policy created actionable contract rights under Duldulao v. St. Mary of Nazareth Hosp. Ctr., 115 Ill.2d 482, 490, 505 N.E.2d 314, 318 (1987).

[18] Only evidence that is admissible at trial is admissible for purposes of summary judgment (see, e.g., Haywood v. Lucent Techs., Inc., 323 F.3d 524, 533 (7th Cir. 2003)). Nolan and Suski proffer excerpts from notes allegedly taken by EEOC investigator Timothy Akbar during an interview with Waukegan Station director Bob Duey. But without any accompanying declaration from the notetaker, those incomplete notes are of dubious value--it is difficult to discern precisely what the interviewee was saying and impossible to tell to what questions he was responding. And because the notes are unsigned and unauthenticated so as to be inadmissible at trial, this opinion will not consider them here.

16

during the first quarter of 2004,[19] informing him that he missed 40 hours of work in violation of Midwest's attendance policy (N-S Resp. St. ¶70(c)).[20] But Nolan's only absences during that first quarter came when he missed five days--40 hours--because he had the flu (M. St. ¶35). According to the attendance policy, short-term illnesses (such as the flu) are "controllable" and thus fall within the scope of the attendance policy's disciplinary measures (M. St. ¶60).

When Midwest demoted Nolan and Suski, it informed them in writing that their demotions were caused by their inability to fulfill their job functions because of excessive absences, with no mention of any part of the attendance policy (M. St. ¶¶57-58). Midwest then took no disciplinary action against them when they continued to fail to come to work for months after those demotions. Nor would Midwest have had any reason to do so: Nolan's and Suski's extended absences were the byproduct of uncontrollable long-term injuries. No admissible evidence indicates that the demotions were disciplinary in nature, and no such inference would be reasonable based on the record.

---

[19] Nolan also received a "Coaching and Counseling Document" from his supervisor at the beginning of 2004, attempting to convince him to improve his attendance (N-S St. ¶70(c)).

[20] Suski cites his own deposition to establish that he also suffered disciplinary action under the attendance policy (N-S St. ¶70(d)), but the transcript makes clear that he has no basis, other than his own belief, for the proposition that his demotion was disciplinary in nature.

17

Accordingly the breach of contract claims are also dismissed.

## Conclusion

This Court is not a superpersonnel board that can be invoked by frustrated employees to second-guess the wisdom or efficiency of an employer's legitimate management decisions. Nolan and Suski were not demoted in an attempt to discipline or discriminate against them, but rather because their unfortunate injuries rendered them unable to meet Midwest's legitimate performance and attendance expectations for their positions.

Midwest has shown that no genuine issues of material fact exist and that all of Nolan's and Suski's claims lack merit. Hence Midwest is entitled to a judgment as a matter of law. This action is dismissed in its entirety.

_____
Milton I. Shadur
Senior United States District Judge

Date: July 29, 2008